## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES,<br>　　*Plaintiff,*<br><br>　　　v.<br><br>GEOFFREY SHAPIRO,<br>　　*Defendant.* | No. 3:20-cr-45 (VAB) |

## RULING AND ORDER ON MOTION TO SUPPRESS

Geoffrey Shapiro has been charged with Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, and Bank Robbery, in violation of 18 U.S.C. §§ 2113(a) and (d). Indictment, ECF No. 1 (Mar. 10, 2020).

Mr. Shapiro has moved under the Fourth and Fifth Amendments of the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress evidence seized during and after his arrest on February 21, 2020, as well as statements made during a subsequent interrogation. Mot. to Suppress at 1, ECF No. 93 (Feb. 6, 2024) ("Mot."). The Government opposes the motion. Gov't Opp'n to Mot. to Suppress, ECF No. 100 (Feb. 27, 2024) ("Opp'n").

On April 24, 2024, the Court held an evidentiary hearing on Mr. Shapiro's motion. *See* Min. Entry, ECF No. 111 (Apr. 24, 2024).

After the hearing, the parties submitted additional briefing. *See* Post-Hearing Mem. in Supp. of Mot. to Suppress, ECF No. 121 (May 28, 2024) ("Post-Hearing Mem."); Gov't Post-Hearing Opp'n Mem., ECF No. 128 (June 18, 2024) ("Post-Hearing Opp'n"); Post-Hearing Reply Mem. in Supp. of Mot. to Suppress, ECF No. 129 (June 25, 2024) ("Post-Hearing

1

Reply"); Gov't Mot. for Leave to File a Sur-Reply, ECF No. 130 (June 26, 2024) ("Post-Hearing Sur-Reply").

For the following reasons, Mr. Shapiro's motion to suppress is **DENIED in part and DENIED without prejudice to renewal in part**.

The evidence seized during and after Mr. Shapiro's arrest will not be suppressed. Mr. Shapiro's post-arrest statements will not be suppressed, for now. But, if the Government chooses to rely on this evidence at trial, Mr. Shapiro may renew his motion to suppress these post-arrest statements and the Government will need to prove that the statements, as well as Mr. Shapiro's waiver of his *Miranda* rights, were voluntary.

## I.     FINDINGS OF FACT

Around 1:30 p.m. on February 21, 2020, Glastonbury Police Department ("GPD") officers responded to a robbery at Webster Bank in Glastonbury, Connecticut. Opp'n at 1; Transcript of Proceedings 6:2–25, ECF No. 116 (May 9, 2024) ("Tr."). The officers learned that the suspect had passed a note to the bank teller implying that he had a gun, taken approximately $1,800, and then fled the scene. Tr. 7:4–12; 21:5–6; Ex. B to Mot. at 4. Through surveillance video footage and witness testimony, the officers learned that the suspect had worn a dark green parka with pockets on the front and a fur-lined hood, dark pants, a dark shirt, and a dark baseball cap with a lighter-colored brim. Tr. 10:2–5. They were also able to determine that he was a white male in his late thirties to early forties, he had brown hair and some stubble, he was over six feet tall, and he walked with a "lanky" gait, taking "long steps with his shoulders . . . rolled forward." Tr. 10:7–11; 14:5–10.

Detective Peter Brander, one of the officers who responded to the scene and participated in the investigation, shared photos from the surveillance system with neighboring police

departments and learned that the same suspect had been involved in two other robberies in the area, including the armed robbery of a Dunkin' Donuts store in Simsbury, Connecticut on February 9, 2020 and the robbery of a bank in Westfield, Massachusetts on February 11, 2020. Tr. 10:12–11:4; Ex. B. to Mot. at 5. During the Dunkin' Donuts robbery, the suspect had brandished a pistol. *Id.* at 1.

The police officers examined security footage, which showed that, after leaving the bank, the suspect walked toward a dark colored Kia Soul and drove away. *Id.* at 2. Police officers were able to observe the license plate of the suspect vehicle because the car was parked directly in front of a surveillance camera. Tr. 11:17–22. Using the license plate number, investigators obtained the car's registration and learned that the car belonged to Carol Shapiro of Windsor Locks, Connecticut, who they later learned had a son named Geoffrey Shapiro. Tr. 16:11–17:10. A search of Geoffrey Shapiro's social media accounts revealed that Geoffrey Shapiro's public profile photo matched photos of the suspect. Tr. 17:11–25. Investigators compared the stills from the surveillance footage with a photograph from Mr. Shapiro's Facebook profile, as well as his driver's license, and found that the physical features were consistent across all three. 18:23–19:13.

Between 4:30 and 5:00 p.m., GPD investigators met with a police officer from the Windsor Locks Police Department ("WLPD") in a park down the street from Ms. Shapiro's residence. Tr. 19:21–23; 20:17–21. During this meeting, the GPD officers learned from WLPD officers that Mr. Shapiro had mental health issues; that WLPD had had several police contacts with Mr. Shapiro and "he was known to be confrontational"; and that Mr. Shapiro had never

been arrested and had no criminal history. Tr. 19:24–20:10. Together, the GPD and WLPD officers determined that they would conduct a "knock-and-talk" with Ms. Shapiro. Tr. 19:16–24.

The police officers went to Ms. Shapiro's home to attempt to make contact, but nobody was home, so they returned to the park to discuss next steps. Tr. 21:11–20. The officers discussed potential precautions that they might take, based on "the felonious nature" of the robberies, the use of a firearm, and the fact that the firearm allegedly used in the robberies had not been recovered. Tr. 21:23–22:7. They also discussed the possibility of the suspect barricading himself inside the house, which they determined "would rise to the level of a SWAT call-out[.]" *Id.*

Between 5:00 and 5:30 p.m., after the sun had set and as it was getting dark, the officers returned to Ms. Shapiro's house to set up surveillance and to see if anyone was coming and going from the residence. Tr. 22:22–23:6; 26:18–22; 58:16–60:3. While driving to the house, about one block away, Detective Brander saw a dark Kia Soul pull into the driveway of the house. Tr. 23:20–24:2; 23:7–9. He identified the car as consistent with the one used in the robbery and communicated that information to other officers in the area. Tr. 24:11–16. Detective Brander's was the first car to approach the house. Tr. 24:13–14. When he parked in front of the house and got out of his vehicle, the driver of the Kia Soul also got out of his car. Tr. 24:15–19. At that time, from approximately forty feet away, Detective Brander noticed that the driver was a tall white male with dark hair, an appearance consistent with the appearance of the bank robbery suspect. Tr. 24:19–23; 35:6–17; 68:17–69:4.

Detective Brander and another officer, Sergeant Saucier, approached the driver. Tr. 33:25–34:3. From the front yard, near the curb line, Detective Brander pointed his firearm at the driver and told him, "police, stop." Tr. 27:23–25. The driver "ignored [Detective Brander's]

4

commands and walked away . . . somewhat casually" toward the house. Tr. 28:14–19. The driver went into the garage of the home while Detective Brander consistently gave him verbal commands to stop and pointed the firearm at him. Tr. 28:18–23.

When the driver reached the connecting door between the garage and the house, and Detective Brander and Sergeant Saucier were at the threshold between the driveway and garage door, the driver stopped and began to obey verbal orders, including putting his hands up and backing away from the door and out of the garage. Tr. 28:24–29:4; 37:1–8; 71:19–25. Detective Brander and Sergeant Saucier placed the driver in handcuffs and took him into custody "just outside of the garage." Tr. 29:5–6.

Detective Brander asked the driver what his name was and why he was not obeying verbal commands, and the driver responded that he did not want to speak. Tr. 38:23–25. Upon seeing the drivers full face close up, Detective Brander confirmed that he was Geoffrey Shapiro. Tr. 39:1–8. Detective Brander and Sergeant Saucier conducted a search of Mr. Shapiro's person, including his backpack. Tr. 39:14–18. The officers discovered $460 in cash in a wallet in Mr. Shapiro's pants pocket, Ex. B to Mot. at 7, as well as two cell phones, a sheathed hunting knife, medical documentation, and $1,300 in cash in his backpack, *id.*; Tr. 39:19–23.

The officers then put Mr. Shapiro into the patrol car to transport him to the police department. Tr. 39:14–18. The officers shined their flashlights into the Kia Soul to ensure that nobody else was in the car. Tr. 40: 3–5; 15–17. The officers towed the Kia Soul from the scene to impound it at the GPD pending a search warrant for the car. Tr. 41:16–21.

Shortly after, Ms. Shapiro arrived at the house and signed a consent-to-search form allowing the officers to search Mr. Shapiro's living area in the basement of the home. Tr. 40:18–41:4; 75:20–76:24. Ms. Shapiro also shared with Detective Brander that Mr. Shapiro was

diagnosed with schizophrenia and that he had been off his medications for some time. Tr. 76:6–11. When officers searched the basement, they found a Boston Red Sox baseball cap that matched the hat worn by the suspect in the Westfield and Simsbury robberies. Tr. 41:7–13.

After searching the basement, Detective Brander returned to the police department, where Mr. Shapiro was being held. Tr. 76:12–19. That same night, Detective Brander and FBI Special Agent Lisa MacNamara interviewed Mr. Shapiro for somewhere between one and a half and two hours, ending around 11:30 p.m. Tr. 76:17–77:6. Mr. Shapiro was provided with a notice of his rights, but was not permitted to speak to a lawyer or anyone other than an officer. Mem. at 11. Mr. Shapiro repeatedly refused to answer any questions about his alleged crimes, but eventually provided several admissions. *Id.* During the interview, there were indications of Mr. Shapiro's mental illness, including descriptions of his auditory hallucinations. Tr. 77:16–23.

The next day, on February 22, 2020, Detective Brander wrote an affidavit in support of a search warrant application for the Kia Soul. Tr. 78:15–79:11. The affidavit described the items seen inside the Kia Soul at the time of Mr. Shapiro's arrest but did not include a description of the events leading up to Mr. Shapiro's arrest. Tr. 79:8–80:13.

Once the search warrant was approved, officers searched the car and found a black flat-brimmed hat, a green jacket with a fur-trimmed hood, $1,038 in cash, a pistol, a handwritten robbery note, a J.C. Penny receipt, sneakers, boots, a pair of socks, and a pair of pants. Mem. at 3.

## II.    DISCUSSION

Mr. Shapiro has moved under the Fourth and Fifth Amendments to suppress evidence seized during and after his arrest, as well as statements made during his interrogation at the police station that same night. Mem. at 1. He argues that his warrantless arrest was

unconstitutional because it occurred in the curtilage of his home and in the absence of any exigent circumstances. *Id.* at 4. Mr. Shapiro also argues that the subsequent searches and interrogation must be suppressed because they resulted from violations of his Fourth and Fifth Amendment rights. *Id.*

The Government argues that Mr. Shapiro's warrantless arrest, as well as the subsequent searches, were constitutional because they occurred in a public space. Opp'n at 1. In the alternative, the Government argues that exigent circumstances justified the arrest. *Id.*

The Court will first provide an overview of the relevant Fourth Amendment caselaw and address the constitutionality of the arrest and searches executed on February 21, 2020. Second, the Court will consider the admissibility of statements elicited during the interrogation under the Fifth Amendment.

### A.  The Fourth Amendment Claim

The Fourth Amendment provides that the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. "When it comes to the Fourth Amendment, the home is first among equals." *See Florida v. Jardines*, 569 U.S. 1, 6 (2013). At the Amendment's "very core" is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). The Fourth Amendment's warrant requirement guarantees the fundamental right to be free from government intrusion into the privacy of one's home. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (citing *Payton v. New York*, 445 U.S. 573, 585–86, 589–90 (1980)). Consequently, "absent exigent

circumstances[,] a warrantless search of one's home or its curtilage, when effected through trespass, violates the Fourth Amendment." *United States v. Lace*, 669 F.2d 46, 56 (2d Cir. 1982).

The parties do not dispute that police officers arrested Mr. Shapiro and conducted several searches without a warrant on the evening of February 21, 2020. Mem. at 4, 9–10; Opp'n at 2–3. Rather, the parties dispute whether those events took place in a public space or within the home of Mr. Shapiro, and whether the circumstances surrounding those events otherwise justified the warrantless arrest and searches. The Court therefore need not discuss whether the police actions constituted a search or a seizure, and instead, will proceed to consider the two contested issues: (1) whether the arrest and searches took place in a public space or at Mr. Shapiro's home, and (2) whether exigent circumstance nonetheless justified the police officer's actions.

### 1. The location of Mr. Shapiro's seizure

Fourth Amendment protections extend to seizures of the person, *see Henry v. United States*, 361 U.S. 98, 100 (1959), and "common law arrests are [therefore] considered Fourth Amendment seizures." *Torres*, 592 U.S. at 311–12 ("The "seizure" of a "person" plainly refers to an arrest."); *Payton v. New York*, 445 U.S. 573, 585 (1980) ("the arrest of a person is 'quintessentially a seizure.'" (quoting *United States v. Watson*, 423 U.S. 411, 428 (1976) (J. Powell concurring))).

"An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). As to the first category, arrests effected through the application of physical force do not require the defendant to submit. *Torres*, 592 U.S. at 313 ("the application of force gives rise to an arrest,

even if the officer does not secure control over the arrestee"). Moreover, any touch, however slight, will satisfy the requirement. *Id.* at 313–14.

As to the second type of arrest, the standard for an assertion of authority is an objective one. A show of authority has been made "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As described above, such a show of authority is not alone sufficient to constitute an arrest. Rather, the defendant must also, in some way, yield to that authority. *See Hodari*, 499 U.S. at 629 ("assuming that [the police officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized"). "[A] seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Torres*, 592 U.S. at 322 (2021).

Importantly, "A seizure is a single act, and not a continuous fact[.]" *Thompson v. Whitman*, 85 U.S. 457, 471 (1874). "For centuries, the common law rule has . . . clearly fix[ed] the moment of the seizure." *Torres*, 592 U.S. at 323.

The parties disagree about the location of Mr. Shapiro's arrest. This dispute flows, in part, from different interpretations of the moment at which Mr. Shapiro was arrested, or seized, under the Fourth Amendment.

Mr. Shapiro argues that he was arrested at the moment he began to obey Detective Brander's verbal commands, inside his garage. Post-Hearing Mem. at 2–3. Alternatively, Mr.

Shapiro argues that, even if he was not seized until he was handcuffed, that event took place at the top of his driveway, within the curtilage of his home. Post-Hearing Reply at 1–2.

The Government argues that Mr. Shapiro was arrested in a public place because his arrest took place in the driveway of his residence, an area in which he allegedly had no reasonable expectation or privacy. Post-Hearing Opp'n. at 2. Alternatively, the Government argues that because Detective Brander initiated Mr. Shapiro's arrest from the public roadway and when Mr. Shapiro was outside of his home, Mr. Shapiro could not retreat into his home in order to avoid an otherwise proper arrest. *Id.* at 4–5.

The Court disagrees.

As described above, for the purposes of determining the moment of seizure, the pertinent consideration is whether the police have used physical force or the defendant has in any way submitted to the assertion of authority. *See Hodari*, 499 U.S. at 626 ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."). It is well-established that a police officer's pursuit of a suspect, even while brandishing a weapon, does not constitute a seizure; rather, such a pursuit is a "show of authority" that, unless accompanied by submission or the use of physical force, does not qualify as a Fourth Amendment seizure. *See, e.g.*, *id.* at 629 (because the defendant did not obey the officer's orders to halt or otherwise submit, he was not seized during the course of the pursuit until he was tackled); *Brower v. Inyo County*, 489 U.S. 593, 596 (1989) (police cars with flashing lights chased the suspect for twenty miles, but because he never submitted to this show of authority and in fact did not stop until he fatally crashed into a police-erected blockade, he was never seized); *Hester v. United States*, 265 U.S. 57, 58 (1924) (revenue agents pursued moonshiners without a warrant and fired a pistol,

causing them to drop containers of moonshine whisky, but such evidence was deemed admissible because no Fourth Amendment seizure had taken place).

As a result, the locations of both Detective Brander and Mr. Shapiro when Detective Brander saw Mr. Shapiro, drew his gun, and began giving Mr. Shapiro verbal commands are irrelevant. Dr. Brander's testimony clearly indicates that Mr. Shapiro began to obey verbal commands when he was standing at the threshold of the interior door between the garage and the house. Tr. 28:24–29:4 ("He went through the garage and up to the connecting door into where his home is. He stopped at the door. . . . then he backed out away from the door out of the garage, started obeying my verbal commands to back up towards me, back up towards the sound of my voice . . .").

Accordingly, Mr. Shapiro was seized in the garage, when he began to obey Dr. Brander's verbal commands.

      2.   <u>The curtilage analysis</u>

The curtilage, or the area "immediately surrounding and associated with the home" is "part of the home itself for Fourth Amendment purposes." *Oliver v. U.S.*, 466 U.S. 170, 176 (1984). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *California v. Ciraolo*, 476 U.S. 207, 213 (1986). Private property that extends outside of a home's curtilage, on the other hand, is considered an "open field," and carries no such Fourth Amendment protections; warrantless, and even suspicionless, searches that occur in an open field do not violate the Fourth Amendment. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013).

When determining whether a given area is part of a home's curtilage, courts apply a four-factor test that weighs: "the proximity of the area claimed to be curtilage to the home, whether

the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Alexander*, 888 F.3d 628, 632 (2d Cir. 2018) (quoting *United States v. Dunn*, 480 U.S. 294, 297 (1987)). This test is not "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Dunn*, 480 U.S. at 297. The factors are merely "useful analytical tools . . . that . . . bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* "Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis." *United States v. Reilly*, 76 F.3d 1271, 1276–77 (2d Cir. 1996) (quoting *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980), *cert denied*, 450 U.S. 917 (1981)). The "touchstone" of the inquiry always remains whether the defendant had a legitimate expectation of privacy in the given area. *Id.*

There is no bright line test to determine whether an area falls within the curtilage of a home, but both the Supreme Court and the Second Circuit have considered the question of curtilage in numerous cases. *See, e.g.*, *Dunn*, 480 U.S. at 297 (finding that a barn located fifty yards from a fence surrounding a ranch was not part of the home's curtilage; *United States v. Hayes*, 551 F.3d 138, 145 (2d Cir. 2008) (affirming the district court's finding that a brushy area approximately sixty-five feet from the back door of a house and bordering an adjoining property was not within the curtilage of the home); *Reilly*, 76 F.3d at 1275 (affirming the district court's finding that a cottage 375 feet from the main residence and a wooded area 125 feet away, both of which were well-maintained, pastoral, and enclosed by a fence and hedgerows, constituted

curtilage); *Alexander*, 888 F.3d at 633 (reversing the district court and finding that the area in front of a shed, just a few steps from a home's back door, was part of the home's curtilage).

Mr. Shapiro argues that the garage, where he was seized, is either part of the house or its curtilage, Post-Hearing Mem. at 3, and the Government does not seriously dispute that argument, Post-Hearing Opp'n. at 5 (arguing that Mr. Shapiro was arrested outside of the garage and implicitly suggesting that the garage enjoys heightened Fourth Amendment protections).

The Court agrees.

"Many courts have ruled that garages (particularly those attached to a home) are part of the home or part of the curtilage and thus fully entitled to Fourth Amendment protection." *Conroy v. Caron*, 275 F. Supp. 3d 328, 342 (D. Conn. 2017) (collecting cases); *see also Vinson v. Vermilion Cty., Ill.*, 776 F.3d 924, 929 (7th Cir. 2015) (noting that "[t]he Vinsons' attached garage and the areas immediately surrounding their home and garage fit comfortably within the scope of the Fourth Amendment's protections of the home"); *United States v. Oaxaca*, 233 F.3d 1154, 1157–58 (9th Cir. 2000) (noting that "[i]n the face of clearly contrary law, the Government asserts that the agents were not required to obtain an arrest warrant because Oaxaca's attached garage is not part of his home," and holding that "a person's garage is as much a part of his castle as the rest of his home"). And, in this particular case, the *Dunn* factors weigh in favor of a finding of curtilage. Ms. Shapiro's garage was directly attached to the home, with a doorway connecting the two spaces. Tr. 38:3–4. The garage was enclosed within the perimeter of the

home, Tr. 70:24–25, and shielded from public view by a pedestrian door and a liftable garage door. Tr. 37:9–16.

Taken together, the garage was "so intimately tied to the [Shapiros'] home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 297.

Even if the Fourth Amendment seizure had taken place when Mr. Shapiro was handcuffed outside of the garage at the top of the driveway, as the Government suggests, the Court's analysis would be no different. The 90-degree enclave created by the garage door and the side of the house, where Mr. Shapiro was detained, is a small, unenclosed space hidden from view of the front door of the home but visible from the street. Mem. at 2. The area functions as "a private storage space, holding a wide-ranging array of items, including a wheelbarrow, bags of mulch and lawn seasoning, a medicine bowl, and a chalkboard." *Id.*; *see also* Ex. A (depicting the enclave).

The enclave's proximity to the home, as well as its use for storage and parking both weigh heavily in favor of a finding of curtilage, despite the area's lack of enclosure and visibility from the street. *See Jardines*, 569 U.S. at 6 (explaining that the area "immediately surrounding and associated with the home" is the very definition of curtilage); *Alexander*, 888 F.3d at 633 (finding that a driveway whose "primary use" was for parking cars, and which was at least occasionally used for recreation, fell within the curtilage of the home); *id.* (finding that the enclosure and visibility factors were neutral where the defendant "neither fully enclosed any part of his property with fencing, nor separated the area in front of the shed from the home by running a fence between them"). Because the area appears, like the garage, to be utilized as an extension of the Shapiro family's living space, it too, falls within the curtilage of the home and is

therefore entitled to Fourth Amendment protection. *Jardines*, 569 U.S. at 7 (curtilage is classically understood as "an area adjacent to the home and to which the activity of home life extends" (internal citation omitted)).

Accordingly, regardless of whether Mr. Shapiro's arrest occurred when he began to obey Detective Brander's verbal orders or when he was handcuffed and detained, Mr. Shapiro's arrest occurred in the curtilage of his home.

       3.   The exigent circumstances issue

It is well-settled that the warrant requirement is relaxed where exigent circumstances demand that law enforcement agents act quickly. *MacDonald*, 916 F.2d at 769. "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Id.* at 769 (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970) (in banc)).

Exceptions to the warrant requirement are "few in number and carefully delineated," *see United States v. United States District Court*, 407 U.S. 297, 318 (1972), and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests[,]" *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). Courts have held that the need to assist a person who is seriously injured or threatened with injury, or the need to prevent the imminent destruction of evidence, may constitute an exigent circumstance. *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011); *see, e.g.*, *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298–

299 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770–771 (1966) (imminent

destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (ongoing fire).

The "common theme" is "the existence of a true emergency." *Id.* "'[G]eneral knowledge,

without more, cannot support a finding of exigency' because that inquiry must rely on the

particular circumstances that create exigency specific to each case." *United States v. Caraballo*,

831 F.3d 95, 103 (2d Cir. 2016) (quoting *Harris v. O'Hare*, 770 F.3d 224, 235 (2d Cir. 2014)).

Moreover, "a warrantless [entry or] search must be strictly circumscribed by the exigencies

which justify its initiation . . . ." *Mincey*, 437 U.S. at 393 (internal quotation marks omitted).

When determining whether exigent circumstances existed in a given situation, courts

consider the following factors:

> (1) the gravity or violent nature of the offense with which the suspect
> is to be charged; (2) whether the suspect "is reasonably believed to
> be armed"; (3) "a clear showing of probable cause . . . to believe that
> the suspect committed the crime"; (4) "strong reason to believe that
> the suspect is in the premises being entered"; (5) "a likelihood that
> the suspect will escape if not swiftly apprehended"; and (6) the
> peaceful circumstances of the entry.

*MacDonald*, 916 F.2d at 769–770 (quoting *Dorman*, 435 F.2d at 392–93). These factors are

intended as "an illustrative sampling of the kinds of facts to be taken into account" but they are

not an "exhaustive canon." *Id.*; *see also United States v. Crespo*, 834 F.2d 267, 270–71 (2d Cir.

1987) ("The presence or absence of any one factor is not conclusive; rather, the essential

question is whether there was 'urgent need' that 'justif[ied]' the warrantless entry." (alteration in

original) (quoting *Dorman*, 435 F.2d at 391)). Occasionally, the presence of a single factor will

suffice to establish exigent circumstances, while in other situations, the presence of several

factors may fail to establish exigent circumstances. *MacDonald*, 916 F.2d at 769–770.

The *MacDonald* test "turns on [an] . . . examination of the totality of the circumstances

confronting law enforcement agents in the particular case." *MacDonald*, 916 F.2d at 769.

Whether exigent circumstances exist in a given case is a question of fact, and a district court's determination will not be reversed unless clearly erroneous. *Id.* (citing *United States v. Cattouse*, 846 F.2d 144, 146 (2d Cir. 1988).

Mr. Shapiro argues that exigent circumstances did not justify his warrantless arrest. Acknowledging the seriousness of the offense conduct charged in this case, he emphasizes that the gravity or violent nature of the offense is not the end of the *MacDonald* inquiry. Mr. Shapiro emphasizes that, when approached by Detective Brander and Sergeant Saucier, he did not present an imminent danger to the officers. Post-Hearing Mem. at 8–9. He notes that after he was engaged by the officers, he did not run, reach for a gun, or violently resist arrest, but rather "casually" "shuffle[d]" into the garage. *Id.* at 9. That the officers followed him into the garage—rather than calling for backup, tasing him, or otherwise seeking to shield themselves—is, in Mr. Shapiro's view, evidence that they did not perceive him to pose a threat. *Id.* at 9–10.

Mr. Shapiro also argues that it is unclear what evidence he could have destroyed or disposed of, or how he could have escaped, given that they could have secured the perimeter of the house and apprehended him if he sought to leave. *Id.* at 10. Finally, Mr. Shapiro emphasizes that Detective Brander did not definitively identify the driver of the Kia Soul as Mr. Shapiro until he was detained, meaning that he also did not have any reason to believe that the individual who exited the car was armed. *Id.* at 11. In sum, Mr. Shapiro alleges that there was no emergency presenting "an urgent need to render aid or take action." *Id.* at 8–9 (quoting *MacDonald*, 916 F.2d at 770).

The Government argues that exigent circumstances justified the warrantless arrest of Mr. Shapiro. Post-Hearing Opp'n at 8. It emphasizes that Mr. Shapiro was the suspect in three robberies, and that he was reasonably believed to be armed, as the firearm used in the Simsbury

17

robbery had not been recovered. *Id.* at 9. The Government asserts that Detective Brander had probable cause to arrest Mr. Shapiro based on law enforcement's thorough investigation (including conducting witness interviews, reviewing surveillance footage, and performing online law enforcement database and social media searches), which had yielded "extensive evidence" indicating that he had committed the robberies. *Id.* at 10–11. It also emphasizes that the Kia Soul and its driver matched the vehicle and suspect shown in surveillance footage. *Id.* at 11.

The Government concedes that there was no direct evidence that Mr. Shapiro would escape, but notes that the officers did fear that a delay in arrest could have led to the destruction of evidence. *Id.* at 12. Finally, it emphasizes that the officers did not enter the Shapiro home, nor did they use any force to gain entry to the driveway or garage. *Id.* Taken together, the Government argues that exigent circumstances existed at the time that Detective Brander and Sergeant Saucier approached and arrested Mr. Shapiro.

The Court agrees.

As both parties acknowledge, the first *MacDonald* factor, the gravity or violent nature of the offense, weighs in favor of a finding of exigent circumstances. Reply at 4; Opp'n at 7. Robbery is a serious, violent offense. Moreover, Mr. Shapiro had allegedly committed three separate robberies committed over the course of two weeks, including one earlier that very day. Opp'n at 1; Tr. 10:18–11:8. Two of the robberies involved a gun. Ex. B to Mot. at 4–5.

The second *MacDonald* factor, whether the suspect is reasonably believed to be armed, also weighs in favor of finding exigent circumstances. Although Mr. Shapiro argues that this factor is neutral because the officers did not identify the driver of the Kia Soul as Mr. Shapiro until after the arrest, Detective Brander testified to having recognized the dark Kia Soul that parked in the driveway of the Shapiro home, the same car used in the bank robbery. Tr. 23:20–

24:2. After recognizing the car, and before approaching the house, Detective Brander observed an individual getting out of the Kia Soul "who was consistent with [the] bank robbery suspect" in that "[h]e was a tall white male with brown hair and he had a dark backpack on." Tr. 24:19–25:15.

Based on these two facts, the officers had sufficient information to reasonably suspect that the driver of the Kia Soul was the individual who had committed the robberies and who was known to have access to a gun. And, because the officers reasonably suspected that the driver of the Kia Soul was the robbery suspect, it was reasonable to believe that he might have access to—and, indeed, had recently used—a gun.

The third *MacDonald* factor, whether there is a clear showing of probable cause to believe that the suspect committed the crime, also weighs in favor of finding exigent circumstances. As noted above, after the Webster Bank robbery, law enforcement officers' investigation included interviewing eyewitnesses, reviewing surveillance footage, tracing the license plate of the suspect car in order to determine its owner, and searching social media. Ex. B to Mot. at 4–6; Post-Hearing Opp'n at 10–11. Indeed, by the time they observed the Kia Soul pull into the driveway, the officers had substantial evidence suggesting that it was the suspect car and that the driver was both the suspect and Geoffrey Shapiro.

The fourth *MacDonald* factor, whether there was strong reason to believe that the suspect was in the premises being entered, also weighs in favor of finding exigent circumstances. Here, the officers directly observed the driver of the car, whom they had probable cause to believe was the suspect, enter the garage.

The fifth *MacDonald* factor, the likelihood that the suspect will escape if not swiftly apprehended, does not weigh strongly in either direction. Mr. Shapiro argues, and the

19

Government concedes, that "there is no direct evidence that [Mr. Shapiro] would escape". Post-Hearing Mem. at 10 (internal quotation marks omitted); Post-Hearing Opp'n at 12. The Government emphasizes that the officers feared any delay in arrest would allow Mr. Shapiro to destroy evidence, Post-Hearing Opp'n at 10, while Mr. Shapiro argues that officers would have apprehended him if he had attempted to leave the residence to dispose of evidence, Post-Hearing Mem. at 10. Because there is no significant evidence to support either assertion, the Court makes no finding as to this factor.

The sixth *MacDonald* factor, the peaceful circumstances of the entry, also does not weigh in favor of finding exigent circumstances. While, as the Government argues, there was no forcible entry into Mr. Shapiro's home and the officers did not use any physical force to enter the driveway, Opp'n at 10, the officers did pursue Mr. Shapiro at gunpoint into his garage. Reply at 6.

Altogether, the *MacDonald* factors weigh in favor of a finding of exigent circumstances. While the Court is mindful that exceptions to the warrant requirement should be "few in number and carefully delineated," *see United States*, 407 U.S. at 318, the facts of this case warrant such an exception.

From surveillance footage, eyewitness interviews, a review of motor vehicle registration records, and a review of social media accounts, at the time of their pursuit of Mr. Shapiro, Detective Brander and Sergeant Saucier had more than a sufficient basis to believe that Mr. Shapiro had committed not just armed robbery that very day—during the Webster Bank robbery, he told bank employees that he had a weapon, Tr. 21:5–6—but also that he had committed two other robberies—including the robbery of the Dunkin Donuts, when he brandished a gun, Tr. 87:3–9—all within a span of less than two weeks. Tr. 10:12–11:4; Ex. B. to Mot. at 5. Thus, at

the time of his arrest, these officers reasonably believed that Mr. Shapiro might be armed. Tr. 87:19–22. They also knew that Mr. Shapiro, who had a history of mental health issues, had been confrontational with law enforcement in the past. Tr. 19:24–20:10. And when they arrived at the house, and confronted Mr. Shapiro, rather than comply with their commands, he instead moved further away from them and closer towards his house. Tr. 27:23–28:2; 28:14–25.

Under these specific circumstances, these officers "were confronted by an 'urgent need' to render aid or take action." *MacDonald*, 916 F.2d at 769.[1] As a result, although the police officers failed to obtain an arrest warrant for Mr. Shapiro, the exigent circumstances existing at that time sufficiently justified his warrantless arrest.

Accordingly, because there is no underlying Fourth Amendment violation, the evidence seized during and after the arrest will not be suppressed.

## B.  The Fifth Amendment Claim[2]

"The Fifth Amendment guarantees the right against self-incrimination." *Hernandez v. McIntosh*, No. 22-CV-2266 (CM) (RWL), 2023 WL 6566817, at *15 (S.D.N.Y. Oct. 10, 2023)

---

[1] To the extent that Mr. Shapiro relies on *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001) to argue that exigent circumstances did not justify his warrantless arrest, the underlying facts in that case, as well as the arguments pursued by the Government there, are distinguishable from those here. *See* 272 F.3d at 809 ("If the Court accepted the Government's legal argument, it would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest. It would defy reason to hold, as the Government suggests, that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest."). In *Saari*, after police officers had responded to a call regarding "shots fired" at the residence of Mr. Saari's ex-wife, 272 F.3d at 806, they learned upon arrival that shots had not actually been fired, undermining the basis for their initial call to that home. And following their arrival on the scene, "the police did not observe Defendant doing anything suspicious." *Id.* at 810.
Here, for all of the reasons cited above—unlike in *Saari*—the police had more than an ample basis to determine that Mr. Shapiro had been engaged in criminal activity and was armed when they confronted him. And, when he did not obey their commands, they relied on information previously provided about the potential for Mr. Shapiro to be confrontational with law enforcement.
[2] The Government argues that Mr. Shapiro's opening memorandum sought to suppress his post-arrest statements only as a result of the illegality of his arrest, and not on separate Fifth Amendment grounds. Gov't Post-Hearing Sur-Reply at 1, ECF No. 130 (June 26, 2024) ("Post-Hearing Sur-Reply"). It notes that, at the hearing, it objected to any line of questioning related to a Fifth Amendment involuntariness argument, and that Mr. Shapiro did not pursue such questioning. *Id.* at 1–2. Accordingly, the Government has expressed opposition to Mr. Shapiro's involuntariness arguments but has not briefed the issues.

*report and recommendation adopted*, No. 22 CV 2266 (CM), 2024 WL 2959688 (S.D.N.Y. June 11, 2024) (citing U.S. Const. amend. V). Under the Fifth Amendment, involuntary confessions that are the product of mental or physical coercion are not admissible, regardless of the probable falsity or truth of the confession. *See Blackburn v. Alabama*, 361 U.S. 199, 205–06 (1960); *Rogers v. Richmond*, 365 U.S. 534, 543–45 (1961). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citation omitted). In determining whether a confession was voluntary, the Court should examine "the totality of all surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Id.*; *see also Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988) ("There is only one guide—the totality of the circumstances rule. No single criterion controls whether an accused's confession is voluntary . . . ." (citations omitted)). The Government must prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Under the Fifth Amendment, criminal defendants are also entitled to warnings about their right not to incriminate themselves. *Miranda v. Arizona*, 384 U.S. 467–74 (1966). "An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings" when it "becomes a 'custodial interrogation.'" *United States v. FNU*

---

As a preliminary matter, although Mr. Shapiro's opening brief did not discuss Fifth Amendment issues extensively, the motion to suppress plainly sought "to suppress all evidence discovered or seized in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution, including . . . all statements made by Mr. Shapiro to law enforcement in an interview conducted on February 21, 2020." Mot. at 1. And, while the Government objected to questions regarding Mr. Shapiro's interrogation at the hearing, arguing that such questions were "outside the scope of the motion[,]" Tr. 77:24–78:1, neither defense counsel nor the Court directly agreed with that proposition. Rather, defense counsel agreed to cease such questioning because, as she noted, the Court already had a copy of the interview.

Either way, given the importance of the due process issues raised by Mr. Shapiro, as noted below, the Court will provide the parties an additional opportunity to address these issues at a later time, to the extent necessary.

*LNU*, 653 F.3d 144, 148 (2d Cir. 2011). Defendants subject to custodial interrogation can waive their *Miranda* rights "provided [that] the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. A waiver is voluntary if "it was the product of a free and deliberate choice, rather than intimidation, coercion, or deception" and if the defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"It is the Government's burden to demonstrate that a waiver was knowing and voluntary." *Hernandez*, 2023 WL 6566817, at *16 (citing *Berghius v. Thompkins*, 560 U.S. 370, 383–84 (2010)). "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1983) (per curiam)).

Importantly, "[e]ven if a confession is given voluntarily, it may nonetheless be inadmissible if a person lacks the mental capacity to waive knowingly and intelligently." *Hernandez*, 2023 WL 6566817, at *27. Yet, "[a] waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity." *Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988), *cert. denied*, 490 U.S. 1112 (1989) (finding that petitioner waived his *Miranda* rights "[d]espite his low intelligence"); *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) ("[t]he evidence of defendant's disabilities does not show that defendant was so incompetent that he was not aware both of the nature of the right being abandoned and the consequences of the decision to abandon it" (internal quotation marks omitted)).

At the time of Mr. Shapiro's interrogation, law enforcement officers were aware that he had been diagnosed with schizophrenia but had not been taking his medication. Tr. 77:10–14.

23

They nonetheless proceeded to interrogate him without counsel for ninety minutes, continuing to ask questions even after he had indicated that he did not want to answer. Mem. at 4. At the hearing, Detective Brander admitted that, during the interview, there were clear indications of Mr. Shapiro's mental illness. Tr. 77:16–18. For example, during the interview, Mr. Shapiro stated, "There's people that are harassing me, but I don't see them. It's like they're talking behind my back a lot. It would make me look crazy if I said everywhere I go there's voices." Tr. 77:20–23.

Mr. Shapiro has moved to suppress post-arrest statements made during his interrogation with Detective Brander and FBI Special Agent MacNamara under the Fifth Amendment. Mot. to Suppress at 1. Mr. Shapiro emphasizes that, although the officers administered *Miranda* warnings, such warnings cannot act as a "cure-all" or render voluntary otherwise unconstitutional confessions. *Id.* at 10.

Based on the present record, the Court agrees, although it will not resolve this issue definitively, unless the Government chooses to rely on this evidence at trial. If so, Mr. Shapiro may renew his motion to suppress any post-arrest statements.

At this time, given the Court's understanding of Mr. Shapiro's mental state before and during the interrogation, the Court has serious doubts about the voluntariness of any statements or confessions made on the night of February 21, 2020. The totality of these circumstances—law enforcement officers continuing to interrogate Mr. Shapiro without counsel, despite their knowledge of Mr. Shapiro's mental health conditions; his unmedicated state; his attempts to end the questioning; and his clear descriptions of active auditory hallucinations during the interrogation—indicate that Mr. Shapiro's admissions may not have been the result of "a free and voluntary act." *See Green*, 850 F.2d at 902 ("a single factor or a combination of factors

24

considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act").

## III.    CONCLUSION

For the following reasons, Mr. Shapiro's motion to suppress is **DENIED in part, and DENIED without prejudice to renewal in part**.

The evidence seized during and after Mr. Shapiro's arrest will not be suppressed. Mr. Shapiro's post-arrest statements will not be suppressed, for now. But if the Government chooses to rely on this evidence at trial, Mr. Shapiro may renew his motion to suppress these post-arrest statements and the Government will need to prove that the statements, as well as Mr. Shapiro's waiver of his *Miranda* rights, were voluntary.

SO ORDERED at New Haven, Connecticut, this 23rd day of July, 2024.

_/s/ Victor A. Bolden_
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE